**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

PATTI JOHNSON and JOHN CORBETT, Individually and on Behalf of All Others Similarly Situated,

Plaintiffs,

v.

TRANSUNION, LLC,

Defendant.

Civil Action No.:

# CLASS ACTION COMPLAINT

Patti Johnson and John Corbett ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, bring this Class Action Complaint against Defendant TransUnion, LLC ("TransUnion" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiffs allege the following on information and belief, except as to their own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1. This action arises from TransUnion's failure to protect highly sensitive data.

2. TransUnion is a global credit reporting agency with an estimated annual revenue of $4.2 billion that serves millions of individuals and businesses across the United States.[1]

3. Defendant stores various highly sensitive personal identifiable information ("PII") about its current and former clients; however, Defendant lost control over that data when

[1] https://www.linkedin.com/company/transunion/ (last visited August 28, 2025).

cybercriminals infiltrated its insufficiently protected computer systems in a data breach (the "Data Breach").

4. According to a letter sent to Data Breach victims (referred to herein as the "Breach Notice"),[2] Defendant "experienced a cyber incident involving a third-party application serving our U.S. consumer support operations" which resulted in unauthorized access to personal information belonging to current and former clients.

5. The vulnerable and potentially exposed PII at issue of Plaintiffs and the Class stored on Defendant's information network include names, dates of birth, and Social Security numbers.

6. Based upon Defendant's own account, the Data Breach began on July 28, 2025 and was not discovered until two days later on July 30, 2025, and the Data Breach impacted at least 4,461,511 individuals.[3]

7. Defendant lacked effective safeguards to prevent, detect, stop, or mitigate breaches of its systems, thereby allowing cybercriminals unfettered access to steal millions of its current and former clients' PII.

8. On information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII. In short, Defendant's failures placed the Class's PII in a vulnerable position rendering them easy targets for cybercriminals.

9. Plaintiffs Patti Johnson and John Corbett were affected by Defendant's Data Breach. Plaintiffs bring this class action on behalf of themselves, and all others harmed by Defendant's misconduct.

---

[2] The Breach Notice TransUnion sent to impacted individuals is attached hereto as Exhibit A.

[3] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8972-a125b4f8318/3dcd9b7c-bce3-4685-bffd-f728ce96e2fd.html (last visited August 28, 2025).

## PARTIES

10. Plaintiff Patti Johnson is an adult individual and, at all relevant times hereto, was a resident of Saint Paul, Minnesota.

11. Plaintiff John Corbett is an adult individual and, at all relevant times hereto, was a resident of Hartford, Connecticut.

12. Defendant TransUnion, LLC is a limited liability company registered to do business in Delaware with a principal place of business located at 555 West Adams, Chicago, Illinois 60661.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Plaintiffs and Defendant are citizens of different states, and there are over 100 putative Class Members.

14. This Court has personal jurisdiction over Defendant because it personally availed itself to the privileges of conducting business within the Commonwealth of Pennsylvania and has engaged in acts or omissions giving rise to this action within the Commonwealth. Specifically, Defendant has conducted business in this Commonwealth, and the claims asserted herein arise out of or relate to that business.

15. Venue is proper in this Court because the events giving rise to Plaintiffs' claims occurred, in whole or in part, within this in this District.

## BACKGROUND

16. Defendant collects, receives, stores, and maintains the PII of millions of its current and former clients as part of its business.

17. By obtaining, collecting, and storing Plaintiffs' and Class Members' PII and

financial information, Defendant assumed legal and equitable duties and knew or should have known that it was thereafter responsible for protecting Plaintiffs' and Class Members' PII and financial information from unauthorized disclosure.

18. Under state and federal law, businesses like Defendant have duties to protect the PII in its custody and to notify owners of said PII about data breaches.

19. Defendant recognizes these duties, promising in its "Privacy Policy" that "[w]e maintain a comprehensive information security program with administrative (policies, standards, and processes), physical, and technical controls designed to protect the confidentiality, integrity, and accessibility of personal information."[4]

***TransUnion's Data Breach***

20. TransUnion reported to the Attorney General of Maine that it had experienced a cyber incident on July 28, 2025, that it did not discover until two days later on July 30, 2025. The Data Breach involved "unauthorized access… to personal data that was stored on a third-party application."

21. In other words, Defendant's cyber and data security systems were so inadequate that it allowed cybercriminals to obtain files containing a treasure trove of thousands of its clients highly private PII for multiple days.

22. TransUnion has not disclosed the specific data types that were exposed in the Data Breach, but according to its Notification to the Attorney General of Maine, the breach impacted at least 4,461,511 individuals."

23. On or around August 25, 2025, a month after the Data Breach occurred, TransUnion began notifying impacted individuals.

[4] TransUnion LLC Privacy Notice, TransUnion, https://www.transunion.com/privacy/transunion (last visited October 7, 2025).

24. When Defendant did notify Plaintiffs and the Class of the Data Breach, Defendant acknowledged that the Data Breach created a present, continuing, and significant risk of identity theft, providing Plaintiffs and the Class with credit monitoring and "proactive fraud assistance" services.[5]

25. Even with several months' worth of credit monitoring services, the risk of identity theft and unauthorized use of Plaintiffs' and Class Members' PII is still substantially high. The fraudulent activity resulting from the Data Breach may not come to light for years.

26. Due to the obfuscating language in TransUnion's Breach Notice, it is unclear when the Data Breach occurred, how long cybercriminals had access to client PII, and how the Data Breach occurred.

27. Defendant failed its duties when its inadequate security practices caused the Data Breach. In other words, Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from stealing PII it its care. And thus, Defendant caused widespread injury and monetary damages.

28. This incident is only part and parcel of Defendant's pattern of negligent data security. Just three years ago, in August 2022, TransUnion sent a Notice of Security Incident regarding a data breach that impacted customers' personal data.

29. This previous incident further evidences Defendant's lack of adequate cybersecurity measures.

30. Since the Data Breach, Defendant claims that it will "continue to enhance our security controls as appropriate to minimize the risk of any similar incident in the future."[6]

31. But such simple declarations are insufficient to ensure that Plaintiffs' and Class

[5] Ex. A.
[6] Ex. A.

Members' PII will be protected from additional exposure in a subsequent data breach. Indeed, such steps to "minimize risk" should have been in place *before* the Data Breach.

32. TransUnion has done little to remedy its Data Breach. True, Defendant has offered some victims credit monitoring and identity related services. But upon information and belief, such services are wholly insufficient to compensate Plaintiffs and Class Members for the injuries that Defendant inflicted upon them.

33. Because of TransUnion's Data Breach, the sensitive PII of Plaintiffs and Class Members was placed into the hands of cybercriminals inflicting numerous injuries and significant damages upon Plaintiffs and Class Members.

34. Ransomware groups can monetize stolen PII and sell it on the dark web as part of a full identity profile. Buyers can then use that information to conduct different types of identity theft or fraud, such as filing a fake tax return, applying for a fraudulent mortgage or opening a bank account while impersonating the victim.[7]

35. And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the Dark Web, a hub of criminal and illicit activity, to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[8]

***Plaintiff Patti Johnson's Experiences and Injuries***

36. Plaintiff Patti Johnson has been a customer of TransUnion for approximately fifteen years.

37. Throughout Plaintiff Patti Johnson's dealings with Defendant, TransUnion obtained and maintained her PII.

---

[7] *Id.*

[8] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for- sale-on-the-dark-web-should-you-buy-it-back.

38. Through the Data Breach, Plaintiff Patti Johnson's PII was stolen by cybercriminals and now leaves her vulnerable.

39. Plaintiff Patti Johnson is very careful about the privacy and security of her PII. She does not knowingly transmit her PII over the internet in an unsafe manner. Plaintiff Patti Johnson is careful to store any documents containing her PII in a secure location.

40. Plaintiff Patti Johnson provided her PII to Defendant and trusted the company would use reasonable measures to protect it according to TransUnion's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

41. Plaintiff Patti Johnson reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of PII.

42. Thus, on information and belief, Plaintiff Patti Johnson's PII has already been published, or will be published imminently, by cybercriminals on the Dark Web.

43. Through its Data Breach, Defendant compromised Plaintiff Patti Johnson's PII.

44. Plaintiff has spent, and will continue to spend, significant time and effort monitoring her accounts to protect herself from identity theft. After all, Defendant directed Plaintiff Patti Johnson to take those steps in its breach notice.

45. Plaintiff Patti Johnson fears for her personal financial security and worries about what information was exposed in the Data Breach.

46. Because of Defendant's Data Breach, Plaintiff Patti Johnson has suffered, and will continue to suffer, from anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Patti Johnson's injuries are precisely the type of injuries that the law contemplates and addresses.

47. Plaintiff Patti Johnson suffered actual injury from the exposure, theft, and dissemination of her PII on the dark web, which violates her rights to privacy.

48. Plaintiff Patti Johnson suffered actual injury in the form of damages to and diminution in the value of her PII. After all, PII is a form of intangible property, property that Defendant was required to adequately protect.

49. Plaintiff Patti Johnson suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft all because Defendant's Data Breach placed Plaintiff Patti Johnson's PII right in the hands of criminals.

50. Because of the Data Breach, Plaintiff Patti Johnson anticipates spending considerable amounts of time and money to try and mitigate her injuries.

51. Today, Plaintiff Patti Johnson has a continuing interest in ensuring that her PII which, upon information and belief remains backed up in Defendant's possession, is protected and safeguarded from additional breaches.

***Plaintiff John Corbett Experiences and Injuries***

52. Plaintiff John Corbett has been a customer of TransUnion for approximately six years.

53. Throughout Plaintiff John Corbett's dealings with Defendant, TransUnion obtained and maintained his PII.

54. Through the Data Breach, Plaintiff John Corbett's PII was stolen by cybercriminals and now leaves him vulnerable.

55. Plaintiff John Corbett is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner. Plaintiff John Corbett is careful to store any documents containing his PII in a secure location.

56. Plaintiff John Corbett provided his PII to Defendant and trusted the company would use reasonable measures to protect it according to TransUnion's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff John Corbett's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

57. Plaintiff John Corbett reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of PII.

58. Thus, on information and belief, Plaintiff John Corbett's PII has already been published, or will be published imminently, by cybercriminals on the Dark Web.

59. Through its Data Breach, Defendant compromised Plaintiff John Corbett's PII.

60. Plaintiff John Corbett has spent, and will continue to spend, significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendant directed Plaintiff John Corbett to take those steps in its breach notice.

61. Plaintiff John Corbett fears for his personal financial security and worries about what information was exposed in the Data Breach.

62. Because of Defendant's Data Breach, Plaintiff John Corbett has suffered, and will continue to suffer, from anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff John Corbett's injuries are precisely the type of injuries that the law contemplates and addresses.

63. Plaintiff John Corbett suffered actual injury from the exposure, theft, and dissemination of his PII on the dark web, which violates his rights to privacy.

64. Plaintiff John Corbett suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property; property that Defendant was required to adequately protect.

65. Plaintiff John Corbett suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft all because Defendant's Data Breach placed Plaintiff John Corbett's PII right in the hands of criminals.

66. Because of the Data Breach, Plaintiff John Corbett anticipates spending considerable amounts of time and money to try and mitigate his injuries.

67. Today, Plaintiff John Corbett has a continuing interest in ensuring that his PII which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from additional breaches.

***Plaintiffs and the Proposed Class Face Significant Risk of Continued Identity Theft***

68. Because of Defendant's failure to prevent the Data Breach, Plaintiffs and Class Members suffered, and will continue to suffer, damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. loss of the opportunity to control how their PII is used;

b. diminution in value of their PII;

c. compromise and continuing publication of their PII;

d. out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identity theft and fraud;

f. delay in receipt of tax refund monies;

g. unauthorized use of their stolen PII; and

h. continued risk to their PII, which remains in Defendant's possession and is thus at risk for futures breaches so long as Defendant fails to take appropriate measures to protect the PII.

69. Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

70. The value of Plaintiffs and Class's PII on the black market is considerable. Stolen PII trades on the black market for years. And criminals frequently post and sell stolen information openly and directly on the "Dark Web"—further exposing the information.

71. It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the PII far and wide.

72. One way that criminals profit from stolen PII is by creating comprehensive dossiers on individuals called "Fullz" packages. These dossiers are both shockingly accurate and comprehensive. Criminals create them by cross-referencing and combining two sources of data; first the stolen PII, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

73. The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiffs and the Class that is available on the internet.

74. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators

and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and other Class Members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

75. Defendant disclosed the PII of Plaintiffs and Class Members for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed the PII of Plaintiffs and Class Members to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

76. Defendant's failure to promptly and properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Defendant Knew or Should Have Known of the Risk of a Data Breach***

77. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

78. In 2021, a record 1,862 data breaches occurred, exposing approximately 293,927,708 sensitive records; a 68% increase from 2020.[9]

79. Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation's ("FBI") 2024 Internet Crime Report details that reported losses from internet crime

[9] *See 2021 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2022) https://notified.idtheftcenter.org/s/.

exceeded $16 billion in 2024; a 33% increase from the prior year.[10]

80. According to the *2023 Annual Data Breach Report*, the number of data compromises in 2023 nearly doubled compared to 2022.[11] In 2023, a record 3,205 breaches occurred, exposing the data of approximately 353,027,892 victims.[12]

81. In 2024, there were 3,158 data breaches with 1,350,835,988 victim notices, a 211% increase year over year.[13]

82. Cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack.[14]

83. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

***Defendant Failed to Follow FTC Guidelines***

84. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses, like Defendant, should use to protect against unlawful data exposure.

85. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices

[10] FBI National Press Office, *FBI Releases Annual Internet Crime Report,* (Apr. 23, 2025), https://www.fbi.gov/news/press-releases/fbi-releases-annual-internet-crime-report.
[11] https://www.idtheftcenter.org/post/2023-annual-data-breach-report-reveals-record-number-of-compromises-72-percent-increase-over-previous-high/ (last visited August 13, 2025).
[12] *Id.*
[13] *2024 Data Breach Report* at 6, Identity Theft Resource Center (Jan. 2025), https://www.idtheftcenter.org/wpcontent/uploads/2025/02/ITRC_2024DataBreachReport.pdf (last visited August 12, 2025).
[14] Ben Kochman, *FBI*, *Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted- ransomware.

businesses must use.[15] The FTC declared that, *inter alia*, businesses must:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

86. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system and then have a response plan ready for such a breach.

87. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

b. limit access to sensitive data;

c. require complex passwords to be used on networks;

d. use industry-tested methods for security;

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

88. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take

[15] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal- information.pdf

to meet their data security obligations.

89. In short, Defendant's failure to use reasonable and appropriate measures to protect against unauthorized access to its current and former clients and/or consumers' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

90. Several best practices have been identified that, at a *minimum*, should be implemented by businesses like Defendant. These industry standards include educating all employees, strong passwords, multi-layer security, including firewalls, anti-virus, and anti-malware software, encryption (making data unreadable without a key), multi-factor authentication, backup data, and limiting which employees can access sensitive data.

91. Other industry-standard best practices include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

92. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

93. These frameworks are applicable and accepted industry standards. And by failing

to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

**CLASS ACTION ALLEGATIONS**

94. Plaintiffs bring this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII was compromised in the Data Breach that occurred between July 28, 2025 to July 30, 2025.

95. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to its departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as its immediate family members.

96. Plaintiffs reserve the right to amend the class definition or to propose subclasses in subsequent pleadings and motions for class certification.

97. This action has been brought and may properly be maintained as a class action under Federal Rule of Civil Procedure Rule 23 because there is a well-defined community of interest in the litigation, and membership in the proposed classes is easily ascertainable.

98. <u>Numerosity</u>: Class Members are so numerous that joinder of all Class Members is impracticable, if not impossible. Upon information and belief, the proposed Class includes 4,461,511 individuals.

99. <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and

all members of the Class sustained damages arising out of and caused by Defendant's common course of conduct in violation of law, as alleged herein.

100. Adequacy: Plaintiffs are adequate representatives of the Class in that Plaintiffs have the same interest in the litigation of this case as the Class Members, is committed to the vigorous prosecution of this case and has retained competent counsel who are experienced in conducting litigation of this nature.

101. Commonality and Predominance: Plaintiffs' and the Class's claims raise predominantly common facts and legal questions which predominate over any questions affecting individual Class Members for which a class wide proceeding can answer for all Class Members, including, but not limited to:

a. Whether Defendant had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's PII;

b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendant was negligent in maintaining, protecting, and securing PII;

d. Whether Defendant breached contract promises to safeguard Plaintiffs' and the Class's PII;

e. Whether Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f. Whether Defendant's Breach Notice was reasonable;

g. Whether the Data Breach caused Plaintiffs' and the Class's injuries; and

h. If Plaintiffs and the Class are entitled to damages, treble damages, and or injunctive relief.

102. Superiority of Class Action: A class action will provide substantial benefits and is

superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members, while not inconsequential, may be relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would be impractical for members of the Class to seek redress individually for the wrongful conduct of the Defendant. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

**COUNT ONE**
**Negligence**
**(On Behalf of Plaintiffs and the Class)**

103. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

104. Plaintiffs and the Class entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

105. At all times herein relevant, Defendant owed Plaintiffs and Class Members a duty of care to act with reasonable care to secure and safeguard their PII and financial information and to use commercially reasonable methods to do so. Defendant took on this obligation upon accepting and storing the PII and financial information of Plaintiff and Class Members in its computer systems and on its networks.

106. Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class could and would suffer if their PII was wrongfully disclosed.

107. Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiffs and Class Members' PII.

108. Defendant owed Plaintiffs and Class Members the following duties:

a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in its possession;

b. To implement industry-standard security procedures sufficient to reasonably protect the PII from a data breach, theft, and unauthorized access;

c. To promptly detect attempts at unauthorized access; and

d. To notify Plaintiffs and Class Members within a reasonable timeframe of any breach to the security of their PII.

109. Thus, Defendant owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breach. This duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

110. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

111. Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiffs and the Class. That special relationship arose because Plaintiffs and the Class entrusted Defendant with their confidential PII, a necessary

part of obtaining services from Defendant.

112. The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant holds vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII, whether by malware or otherwise.

113. Defendant improperly and inadequately safeguarded the PII of Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

114. Defendant breached its duties to Plaintiffs and Class Members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard their PII and financial information.

115. Defendant breached its duty of care to Plaintiffs and Class Members in the following ways:

a. by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard the PII and financial information of Plaintiffs and Class Members;

b. by failing to timely and accurately disclose that Plaintiffs' and Class Members' PII had been improperly acquired and/or accessed;

c. by failing to adequately protect and safeguard Plaintiffs' and Class Members' PII by knowingly disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured PII and financial information;

d. by failing to provide adequate supervision and oversight of the PII with which it was and is entrusted, despite the known risk and foreseeable likelihood of breach and misuse, which permitted an unknown third party to gather PII of Plaintiffs and Class Members, misuse the PII and intentionally disclose it to others without consent;

e. by failing to adequately train its employees not to store PII and financial information longer than absolutely necessary;

f. by failing to consistently enforce security policies aimed at protecting Plaintiffs' and the Class Members' PII and financial information;

g. by failing to implement processes to detect data breaches, security incidents, or intrusions quickly; and

h. by failing to encrypt Plaintiff's and Class Members' PII and financial information and monitor user behavior and activity in order to identify possible threats.

116. Defendant's willful failure to abide by these duties was wrongful, reckless, and grossly negligent in light of the foreseeable risks and known threats.

117. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiffs and Class Members which actually and proximately caused the Data Breach and Plaintiffs and Class Members' injury.

118. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs and Class Members' injuries-in-fact.

119. Defendant has admitted that the PII of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

120. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

121. On information and belief, Plaintiffs' PII has already been published, or will be

published, imminently by cybercriminals on the dark web.

122. Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII.

123. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiffs and the Class Members' sensitive PII.

124. Defendant breached its respective duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

125. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

126. The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and members of the Class.

127. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs and Class Members actual,

tangible, injury-in-fact damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## COUNT TWO
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

128. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

129. Through its course of conduct, Defendant, Plaintiff and Class Members entered into implied contracts for Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class Members' PII and financial information.

130. Plaintiffs and Class Members were required to provide their PII to Defendant as a condition of receiving services provided by Defendant. Plaintiffs and Class Members provided their PII to Defendant in exchange for Defendant's services.

131. Plaintiffs and Class Members reasonably understood that a portion of the funds they paid would be used to pay for adequate cybersecurity measures.

132. Plaintiffs and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

133. Plaintiffs and the Class Members accepted Defendant's offers by disclosing their PII to Defendant in exchange for services.

134. In turn, and through internal policies, Defendant agreed to protect and not disclose the PII to unauthorized persons.

135. In its Privacy Policy, Defendant represented that they had a legal duty to protect Plaintiffs' and Class Member's PII.

136. Implicit in the parties' agreement was that Defendant would provide Plaintiffs and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their PII.

137. Plaintiffs and Class Members would not have entrusted their PII to Defendant in the absence of such an agreement with Defendant.

138. Plaintiffs and the Class fully performed their obligations under the implied contracts with Defendant.

139. Defendant breached its implied contracts with Plaintiff and Class Members by failing to safeguard and protect their PII and financial information and by failing to provide timely and accurate notice to them that their PII and financial information was compromised as a result of the Data Breach.

**COUNT THREE**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

140. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

141. This claim is pled in the alternative to the breach of implied contract claim.

142. By its wrongful acts and omissions described herein, Defendant has obtained a benefit by unduly taking advantage of Plaintiff and Class Members.

143. Defendant appreciated or had knowledge of the benefits it received from Plaintiffs and Class Members.

144. Plaintiffs and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on

Defendant's duties under state and federal law and its internal policies.

145. Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII.

146. Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

147. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs' and Class Members' (1) PII and (2) payment because Defendant failed to adequately protect their PII.

148. Plaintiffs and Class Members have no adequate remedy at law.

149. Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

**PRAYER FOR RELIEF**

Plaintiffs and Class Members respectfully request judgment against Defendant and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representatives, and appointing their counsel to represent the Class;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiffs and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiffs and the Class;

D. Awarding Plaintiffs and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E. Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

F. Awarding attorneys' fees and costs, as allowed by law;

G. Awarding prejudgment and post-judgment interest, as provided by law;

H. Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I. Granting other relief that this Court finds appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial for all claims so triable.

Dated: October 7, 2025

Respectfully submitted,

By: */s/ Sara J. Watkins*

Sara J. Watkins, Esquire
D. Aaron Rihn, Esquire
Robert Peirce & Associates, P.C.
437 Grant Street, Suite 1100
Pittsburgh, PA 15219
Tel: 412-281-7229
Fax: 412-281-4229
swatkins@peircelaw.com
arihn@peircelaw.com